## Table of Contents

Preliminary Statement................................................................................................ 1

The Secrecy Provisions of the Singapore Banking Act
and Its Schedule of Allowed Disclosure.................................................................. 3

ARGUMENT............................................................................................................. 7

Point I

New York's "Separate Entity Rule" Does Not Bar Enforcement of the Subpoena
To Require Deutsche Bank to Produce Documents
From Its Singapore Branch....................................................................................... 7

Point II

CEIR Should Not Be Required to Seek This Discovery in Singapore Through a Letter of Request
Under the Hague Evidence Convention..................................................................... 16

DB's Status Weighs In Favor of Permitting U.S. Discovery.................................... 19

Importance of the Documents Requested.................................................................. 22

The Degree of Specificity of The Requests............................................................... 24

Whether the Information Originated In The United States......................................... 25

Availability of Alternative Means to Obtain the Information..................................... 25

Noncompliance Would Undermine Important Interests of the United States and Singapore.. 26

Whether Compliance Would Impose Any Hardship on DB........................................ 27

DB's "Good Faith" and Motivations for Its Position................................................. 29

Conclusion.................................................................................................................. 30

## Table of Authorities

### Cases

Ayyash v. Koleilat, 38 Misc.3d 916, 957 N.Y.S.2d 574 (Sup. Ct. N.Y. Co. 2012).......... 12

Cronan v. Schilling, 100 N.Y.S.2d 474 (Sup. Ct. N.Y. Co. 1950)..................................... 13

Eitzen Bulk A/A v. Bank of India, 827 F. Supp.2d 234 (S.D.N.Y. 2011)......................... 7, 11, 14

EM Ltd. v. Republic of Argentina, 695 F.3d 201, 208 (2d Cir. 2012)............................... 9

First American Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998).................... 16, 17

Gavilanes v. Matavosian,  123 Misc.2d 868, 475 N.Y.S.2d 987 (N.Y. City Civ. Ct. 1984)...11, 14

Global Technology, Inc. v. Royal Bank of Canada, 34 Misc.3d. 1209, 943 N.Y.S.2d 791 (Sup.
Ct. N.Y. Co. 2012)..................................................................................................... 12

Gucci America, Inc. v. Weixing Li, 2011 WL 6156936 at *11 (S.D.N.Y. Aug. 23, 2011)....... 29

In re Vivendi Universal, S.A., Securities Litigation, 2006 WL 3378115 at *2 (S.D.N.Y. Nov. 16,
2006)........................................................................................................................... 18

Intercontinental Credit Corp. v. Roth, 152 Misc.2d 751, 578 N.Y.2d 955 (Sup. Ct. N.Y. Co.
1990)........................................................................................................................... 11

Jones v. Deutsche Bank AG, 2006 WL 648369 at *4 (N.D. Cal. Mar. 10, 2006)................... 28

JW Oilfield, LLC v. Commerzbank, AG, 764 F.Supp.2d. 587 (S.D.N.Y. 2011)...................... 12

Koehler v. Bank of Bermuda Ltd., 12 N.Y. 3d 533, 883 N.Y.S.2d 763 (2009)...................... 8 , 15

Linde v. Arab Bank PLC, 706 F.3d 92 (2d Cir.  Jan. 18, 2013)............................................ 16, 17

Minpeco S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987)............. 18

Parbulk II AS v.  Heritage Maritime, SA, 35 Misc.3d. 235, 935 N.Y.S.2d 829 (Sup. Ct. N.Y. Co.
2011)........................................................................................................................... 13

Samsun Logix Corp. v. Bank of China, 31 Misc.2d. 1226(A), 929 N.Y.S.2d 202 (Sup. Ct. N.Y.
Co. 2011)..................................................................................................................... 14

Shaheen Sports, Inc. v. Asia Ins. Co., 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012)............... 10

Société Nationale Industrielle Aéreospatiale v. U.S. Dist. Court, 482 U.S. 522,  107 S. Ct. 2542 (1987)........................................................................................................16

Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 78 S.Ct.1087 (1958)...........................................................................16

Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 435 (E.D.N.Y. 2008)....................................18

Thai Lao Lignite (Thailand) Co. v. Government of Lao People's Democratic Republic, 2013 WL 541259  (S.D.N.Y. Feb. 11, 2013)....................................................................... 10

Universitas Education LLC v. Nova Group, Inc., 2013 WL 57892  (S.D.N.Y. Jan. 4, 2013) .. 10

## Statutes And Rules

Federal Arbitration Act, Chapter Two, 9 U.S.C.§ 201 et seq......................................... 26

F.R.C.P. 69 (a)........................................................................................ 7

CPLR 5223 ........................................................................................ 10

CPLR 5224 (a)(1).................................................................................. 8, 10, 12

## Treaties

Hague Convention of the Taking of Evidence Abroad in Civil and Commercial Matters, http://www.hcch.net/index_en.php?act=conventions.text&cid=82 ................................16, passim

U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards.......... 26

## Other

Singapore's reservations in adopting the Hague Evidence Convention, http://www.hcch.net/index_en.php?act=status.comment&csid=569&disp=resdn ............. 24

Singapore's Response to a questionnaire from the Hague Conference on Private International Law, http://www.hcch.net/index_en.php?act=publications.details&pid=4381&dtid=33 ...... 25

Section 442 of the Restatement (Third) of Foreign Relations Law of the United States........ 17

Website of Deutsche Bank AG,  https://www.db.com/usa/content/en/history.html.............. 19

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

IN THE MATTER OF ARBITRATION BETWEEN

CE INTERNATIONAL RESOURCES HOLDINGS LLC,

                 Movant,

-and-                                     12 Civ. 8087 (CM) (SN)

S.A. MINERALS LTD. PARTNERSHIP,

TANTALUM TECHNOLOGY, INC., and YEAP SOON SIT

                 Respondents.

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA *DUCES TECUM* BY DEUTSCHE BANK AG

### Preliminary Statement

Movant CE International Resources Holdings LLC ("CEIR") submits this memorandum in support of its motion for an order under FRCP 37(a) compelling Deutsche Bank AG ("DB") to comply with a Rule 45 subpoena *duces tecum* served on DB in New York that seeks documents believed to be in possession of DB at its Singapore branch where Respondents Yeap Soon Sit ("YSS") and Tantalum Technology Inc. ("TTI") are DB customers. DB objects, and in communications with CEIR before this motion stated that the grounds for its objections are (1) that a rule of New York law called the "separate entity rule" limits the enforceability of this subpoena to documents held by DB in New York -- of which there are assumed to be none, and (2) that the Court should deny enforcement of the subpoena and instead require CEIR to proceed by making a Hague Evidence Convention Letter of Request to the Supreme Court of Singapore

1

(the competent Singapore authority to receive such requests), after taking into account all of the factors relevant to this question under applicable Second Circuit authorities referencing Section 442 of the Restatement (Third) of Foreign Relations Law of the United States, which factors include due consideration of secrecy provisions in the Singapore Banking Act and a schedule of exemptions to those secrecy provisions under which disclosure is permissible.

CEIR had no choice but not make this motion to compel, as DB declined to make a motion for a protective order -- even though it bears the burden of persuasion on its proposed excuses for non-compliance -- unless CEIR stipulated to a position that compliance with the subpoena would violate the Singapore Banking Act.

A full presentation of the reasons for the issuance of this subpoena is made in the Moving Declaration of Marc J. Goldstein, CEIR's counsel.  That Goldstein Declaration also explains the relationships of DB and wholly-owned DB subsidiaries and affiliates to the Respondents, as they were revealed in the underlying AAA international arbitration in which issuance of the Final Award is now awaited.  We will not repeat what is written in the Goldstein Declaration, except to set the stage for this motion to compel by noting: (1) that there are now two unsatisfied contempt fine money judgments amounting to $720,000 against YSS, and contempt fines continue to accrue at $20,000 per day, and so CEIR is acting on behalf of the Court toward collection of those fines through a search for the assets of YSS, and (2) CEIR of course has its own reasons for wanting to search for the assets of YSS via DB now, as he did not comply with the Arbitrator's interim award ordering $10 million of security or a freezing of his assets up to that amount, he contumaciously ignored discovery orders of this Court and the Supreme Court of

British Columbia, and CEIR anticipates having to enforce a Final Award and wishes to address the ongoing risk of dissipation of assets in the most efficient way possible.

Whereas the relevant provisions of Singapore law are submitted via the Goldstein Declaration but are not discussed in the text of that Declaration, we set forth here a discussion of the secrecy provisions of the Singapore Banking Act before proceeding to the legal argument.

**The Secrecy Provisions of the Singapore Banking Act and Its Schedule of Allowed Disclosure**

DB has invoked Section 47 of the Singapore Banking Act ("SBA"), as a foundation for its position that the CEIR should be required to resort to the Hague Evidence Convention. Section 47 is the chapter of the SBA entitled "Banking Secrecy". [1]

Section 47(1) of the SBA states: "Customer information shall not, in any way, be disclosed by a bank in Singapore or any of its officers to any other person except *as expressly provided in this act*." (emphasis supplied).

Section 47(2) of the SBA implements a schedule (called "The Third Schedule," a part of the SBA, and hereinafter referenced as "Schedule III") of exceptions to the prohibition of disclosure. Section 47(2) states:

A bank in Singapore or any of its officers may, for such purposes as may be specified in the first column of the Third Schedule, disclose customer information to such persons as

---

[1] Goldstein Declaration Exhibit H.

3

may be specified in the second column of that Schedule, and in compliance with such conditions as may be specified in the third column of that Schedule.

SBA Section 47(6) specifies the consequences of a violation of 47(1): "Any person who contravenes subsection (1) ... shall be guilty of an offense and shall be liable on conviction --- (a) in the case of an individual, to a fine not exceeding $125,000 or to imprisonment for a term not exceeding 3 years  or to both; or (b) in any other case, to a fine not exceeding $250,000."

Paragraph 7 in the Schedule III,   Column 1, allows disclosure where it is "necessary for compliance with an order of the Supreme Court or a Judge thereof pursuant to the powers conferred under Part IV of the Evidence Act." Part IV of the Evidence Act is entitled "Bankers' Books."[2] Section 175 of the Evidence Act, within Part IV, provides:

"(1) On the application of any party to a legal proceeding, the court or a Judge may order that such party be at liberty to inspect and take copies of any entry in a banker's book for any of the purposes of such proceedings."

Section 174 within Part IV of the Evidence Act further provides:

"An officer of a bank shall not, in any legal proceedings to which the Bank is not a party, be compellable to produce any banker's books the contents of which can be proved under this Part... unless by order of a judge made for special cause."

---

[2] Goldstein Declaration Exhibit I.

4

As explained in the Moving Declaration of Marc J. Goldstein at ¶, in December 2012, the High Court of Singapore granted CEIR's application to compel production by DB of the account records of S.A. Minerals Ltd. under Section 175, and DB complied with that Order.

Paragraph 6 in Schedule III, Column 1, provides that disclosure is allowed where it "is necessary for compliance with a garnishee order served on the bank attaching moneys in the account of the customer." The Banking Act and Schedule III do not provide a definition of "garnishee order" and so CEIR cannot determine, on the face of the statute, what is the scope of that term. DB has yet to take a position in communications with CEIR on whether the judgments of this Court and the Singapore High Court, enforcing the Arbitrator's interim award which required the freezing of YSS assets, are "garnishee orders" within the meaning of Schedule III paragraph 7. But even if those judgments are not precisely "garnishee orders" because they are not Orders of the Court directed to the Bank, the effect of the delivery of those judgments to the Bank in Singapore, which was done by CEIR's Singapore counsel was the same as a garnishee order: to notify the Bank that it should not permit its customer YSS to transact freely in his accounts at the Bank until and unless he complied with the judgments enforcing the Arbitrator's interim award.

Paragraph 5(a) in Schedule III allows disclosure that "is necessary for --- (a) compliance with an order or request under any specified written law to furnish information, for the purposes of an investigation or prosecution, of an offence alleged or suspected to have been committed under any written law." CEIR's subpoena *duces tecum* is "an order of request under [a] specified written law to furnish information." The purpose of the request is to determine if YSS assets that may be applied to satisfy the contempt judgments. The text appears to be ambiguous on whether

5

"offense ... under any written law" refers only to criminal offenses, or may also embrace civil offenses like civil contempt that are closely related to criminal offenses like criminal contempt. A search for YSS assets available to satisfy the contempt judgments would appear to be potentially within "investigation or prosecution" of the offense of civil contempt. And even if the requests in the subpoena are not strictly within the letter of Paragraph 5(a) they are sufficiently aligned with the public policy position evinced by Paragraph 5(a) that the Court should seriously doubt whether (i) Singapore has a sovereign interest in protecting the information from disclosure, and (ii) Singapore would seek to vindicate that sovereign interest by prosecuting DB for making disclosure.

DB bears the burden of persuasion on the question of allowability *vel non* of disclosure under the SBA, the likelihood of DB being prosecuted under the SBA, and the severity of any fine that might be imposed, and as to all elements of its position that CEIR should be required to resort first to the Hague Evidence Convention. (See below at __).  It is not CEIR's burden to show that compliance with the requests would be lawful under the Banking Act, or to show that DB would not be prosecuted. We await DB's arguments and evidence on these points, and refrain at this time from presenting expert evidence about Singapore law and practice.

## ARGUMENT

### Point I

### New York's "Separate Entity Rule" Does Not Bar Enforcement of the Subpoena To Require Deutsche Bank to Produce Documents From Its Singapore Branch

DB's first position in opposition to enforcement of the subpoena, as communicated to CEIR, is that New York's "separate entity rule" (with regard to the treatment of multinational banks in attachment proceedings) applies to a subpoena *duces tecum*.[3] But that very proposition was rejected by Judge Hellerstein in <u>Eitzen Bulk A/A v. Bank of India,</u> 827 F. Supp.2d 234 (S.D.N.Y. 2011).[4] Eitzen involved enforcement of CLPR Article 52 information subpoenas and subpoenas *duces tecum* which had been served on the Bank of India at its New York office but called for information and documents held by the Bank of India in Mumbai.   The Bank of India

---

[3]   By way of background, we refer the F.R.C.P. 69 (a).   It provides in subsection (1) that procedure "in aid of judgment or execution ... must accord with the procedure of the state where the court is located..." It further provides in subsection (2) that "[i]n aid of the judgment or execution, the judgment creditor...may obtain discovery from any person ... as provided in these rules or by the procedure of the state where the court is located. We understand Rule 69 to permit use of a Rule 45 subpoena to a non-party. But in order to be in "accord with" New York State procedure, any relevant limitations New York law would impose on enforceability of a subpoena *duces tecum* are applicable. This makes the applicability, or not, of New York's "separate entity rule" a relevant issue.

CEIR at this time is acting a collection agent for the United States as judgment creditor of YSS, which status was authorized in the Contempt Judgment dated February 8, 2013. DB has not raised any question concerning CEIR's "judgment creditor" status under Rule 69(a)(2).

[4]   An earlier order of Judge Hellerstein on a different issue was vacated by the Second Circuit. The decision discussed here was not reviewed by the Second Circuit.

operations in New York were not separately incorporated; they were the same corporate entity as the Mumbai branch where the relevant information was located.  Judge Hellerstein held that:

1)  "[B]y limiting its responses to material available from within its New York branch, Bank of India has misconstrued the scope of its obligations under New York law." 827 F.Supp.2d at 237-38.

2)  "Under New York law, a subpoena *duces tecum* served on a corporation doing business in or licensed to do business in New York reaches all responsive materials within the corporation's control, even if those materials are located outside New York." Id. at 238.

3)  The decision of the New York Court of Appeals in <u>Koehler v. Bank of Bermuda Ltd.</u>, 12 N.Y. 3d 533, 883 N.Y.S.2d 763 (2009) -- holding that a garnishee corporation over which the New York court has personal jurisdiction may be required to bring foreign property into New York to be applied to satisfy a judgment -- "supports the conclusion that Bank of India's subpoena responses must account for information and materials from branches outside New York." Id. at 239.

4)  Bank of India's reliance on New York's "separate entity rule" -- requiring "that 'each branch of a bank [be] treated as a separate entity for attachment purposes'" -- "was unavailing," because Bank of India "fail[ed] to explain how a rule that requires separate treatment for attachment purposes also requires separate treatment for subpoena purposes, particularly in the face of a contrary, and plainly applicable, state r[u]le of procedure" (referring to CPLR 5224 (a)(1)).


Judge Hellerstein went on to note that there is disagreement in the Courts as to whether <u>Koehler</u> indicates that New York courts will no longer apply the "separate entity rule" to post-judgment writs of execution, turnover orders, and restraining notices.  He agreed with those judges who

8

have read Koehler in this way. But this dimension of Judge Hellerstein's analysis was effectively *dictum*. The narrow and uncontroversial holding is that the "separate entity rule" is not -- and even before Koehler was not or had ceased to be -- a rule that imposes territorial limits on the gathering of information -- not property -- from multi-national banks in aid of execution of a judgment.

As to enforcement of the subpoena, this case is no different than Eitzen. New York law applies, and that law provides, as Judge Hellerstein found, that a subpoena *duces tecum* served upon a bank that is subject to general jurisdiction in New York and whose New York operation is not separately incorporated from the branch where the requested documents are located,  is obligated to produce requested documents within its control including documents held at foreign branches.[5]

Judge Hellerstein's decision in Eitzen received endorsement from the Second Circuit Court of Appeals in EM Ltd. v. Republic of Argentina, 695 F.3d 201, 208 (2d Cir. 2012).  In EM Ltd., the Court affirmed Judge Griesa's order enforcing Rule 45 subpoenas *duces tecum* against third party banks, which had been served as Rule 69 post-judgment discovery devices to search for Argentina's assets located outside the United States. Although the Court's statements were *dictum*

---

[5]    DB has not contended that DB's Singapore branch cannot be required by DB to provide the documents if DB elects to comply with the subpoena.  DB per its New York counsel has stated that the bank in New York cannot directly access customer account records of the Singapore branch via DB's internal computer servers in New York. But that is irrelevant to whether DB has possession, custody and control of the documents.  The Singapore branch is an operating unit of Deutsche Bank AG, not separately incorporated, just as is Deutsche Bank AG in New York.

-- the appeal was taken by Argentina, not the banks, and solely on sovereign immunity grounds -- the Court's position on the question was clear: "[I]n a run-of-the-mill execution proceeding [i.e. without the overlay of a sovereign immunity issue], we have no doubt that the district court would have been within its discretion to order the discovery from third party banks about the judgment debtor's assets located outside the United States." *Id.* And as a foundation for this position the Court observed that "broad post-judgment discovery in aid of execution is the norm in federal and New York state courts," citing FRCP 69 and CPLR §5223. *Id.* And the Court further stated that "the district court's power to order discovery to enforce its judgment does not derive from its ultimate ability to attach the property in question but from its power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments." *Id. Accord,* Thai Lao Lignite (Thailand) Co. v. Government of Lao People's Democratic Republic, 2013 WL 541259 at *8 (S.D.N.Y. Feb. 11, 2013) (Judge Wood); Universitas Education LLC v. Nova Group, Inc., 2013 WL 57892 at *1 (S.D.N.Y. Jan. 4, 2013) (Magistrate Judge Pitman).

Despite these authorities, DB adheres to the position that the "separate entity rule" applies to subpoenas just as it may still apply to orders of attachment. turnover, and writs of execution. In this regard, DB's counsel has referred to Judge Preska's decision in Shaheen Sports, Inc. v. Asia Ins. Co., 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012). But Shaheen is distinguishable in a crucial respect: It did not concern enforcement of a post-judgment subpoena *duces tecum* served on a potential garnishee. Shaheen involved a motion for a turnover order, *i.e.* an order directing the National Bank of Pakistan to turn over funds held in an account of the judgment debtor at a branch in Pakistan. In this case we have not reached to point of service of a turnover order on DB

for funds of YSS in DB accounts. DB has only been served with a subpoena.   As to subpoenas, Shaheen does not suggest that a "separate entity rule" applies.

In the pre-Koehler New York case most prominently cited by Judge Hellerstein in Eitzen, Intercontinental Credit Corp. v. Roth, 152 Misc.2d 751, 578 N.Y.2d 955 (Sup. Ct. N.Y. Co. 1990), Justice Edward Greenfield held that Bank Leumi, served with a post-judgment subpoena *duces tecum* for documents held at the bank in Israel, was obligated to comply provided there was a practical method by which the bank's New York office could obtain the records sought.[6]

Judge Hellerstein in Eitzen also cited a case that had been cited by Justice Greenfield in Intercontinental Credit, Gavilanes v. Matavosian,  123 Misc.2d 868, 475 N.Y.S.2d 987 (N.Y. City Civ. Ct. 1984). In Gavilanes, the Court held Bank of America in contempt for its refusal to respond to a post-judgment information subpoena concerning the deposit account of the judgment debtor held at a branch outside New York.  The bank in Gavilanes brought to the Court's attention case law showing that the "separate entity rule" had been extended to subpoenas in aid of *pre-judgment* attachment, on the theory that there was no point in gathering information in aid of an unavailable remedy, since pre-judgment attachment could not extend to foreign assets.  But the Court found no convincing basis to extend that rationale to post-judgment

---

[6] The order compelling subpoena compliance in the Intercontinental Credit case was later vacated by Justice Greenfield, but on the basis that due to Israel's bank secrecy laws the judgment creditor had to proceed under the Hague Evidence Convention. 154 Misc.2d 639, 595 N.Y.S.2d 602 (Sup. Ct. N.Y. Co. 1991).  Justice Greenfield did not retreat from the position that the "separate entity rule" did not bar enforcement of a subpoena to a multi-national bank's New York office for account records and documents at foreign branches if there was a practical method to have the records sent to New York.

subpoenas, because the information gathered could be used in connection with enforcing the judgment in the foreign jurisdiction after having it registered/domesticated there. That rationale is persuasive and fully applicable here. Whether or not the "separate entity rule" may still be applied, post-Koehler, to prevent enforcement of a post-judgment turnover order in this Court against DB for its depositor's funds in its Singapore branch, the information obtained via subpoena will assist with enforcement of the Contempt Judgments, and potentially the Final Award in the arbitration, through courts outside the United States.

In a recent New York case, Global Technology, Inc. v. Royal Bank of Canada, 34 Misc.3d. 1209, 943 N.Y.S.2d 791 (Sup. Ct. N.Y. Co. 2012), Justice Stallman held that the "separate entity rule" barred enforcement of a post-judgment CPLR 5222 restraining notice, and that the Court of Appeals decision in Koehler did not impliedly abrogate the "separate entity" rule. But in a footnote Justice Stallman stated that the separate entity rule would not limit enforcement of a CPLR 5224 judgment enforcement-related subpoena served on a bank in New York calling for documents located at a branch of the bank outside New York. (n. 12). Justice Stallman's view thus underscores what we have said above about Justice Hellerstein's decision in Eitzen: it is not dependent the controversial position that Koehler abrogated (or heralds the abrogation of) the "separate entity rule". [7]

---

[7] Judge Castel in JW Oilfield, LLC v. Commerzbank, AG, 764 F.Supp.2d. 587 (S.D.N.Y. 2011) concluded that after Koehler the "separate entity rule" does not prevent enforcing turnover order that requires turnover of assets held at a foreign branch of a bank. CEIR may well adopt this position in further proceedings. But this Court need not decide the issue, as the only question now before the court is enforcing a subpoena for documents, not a restraining notice or turnover order.

DB has also referred, in the pre-motion exchanges, to <u>Ayyash v. Koleilat</u>, 38 Misc.3d 916, 957 N.Y.S.2d 574 (Sup. Ct. N.Y. Co. 2012). While Justice Coin in <u>Ayyash</u> did decline to enforce CPLR 5224 information subpoenas and subpoenas *duces tecum* that sought information and records maintained by a multinational bank outside the U.S., the opinion (i) does not cite appellate authority requiring application of the "separate entity rule" to a post-judgment discovery subpoena, (ii) relies on trial-level "separate entity rule" cases that are either out-of-date or do not involve subpoenas, and (iii) is mainly a discretionary denial of subpoena enforcement based on a number of circumstantial factors not present here. Thus:

1) Justice Coin did say that enforcing the subpoena "would negate the well-established separate entity rule," but the cases she cited did not support her position forcefully. One was a trial court decision **from 1950**, <u>Cronan v. Schilling,</u> 100 N.Y.S.2d 474 (Sup. Ct. N.Y. Co. 1950), that involved a *pre-judgment* subpoena *duces tecum* to Swiss Bank Corporation seeking to determine if the Defendant had assets in his account at the bank in Zurich that might be subject to pre-judgment attachment. Enforcement of the subpoena was denied to the extent it sought deposit information about an account in Zurich, because under New York law a New York court could not impose a pre-judgment attachment on the Zurich account. As noted above in the discussion of <u>Gavilan</u>, that rationale does not apply to *post-judgment* subpoenas, which may facilitate enforcement of the judgment via its registration/domestication in the jurisdiction where the assets are situated. The second case cited by Justice Coin, also in a trial court, involved an application for a post-judgment <u>attachment</u> order, not a motion to enforce a subpoena. (<u>Parbulk II AS v. Heritage Maritime, SA</u>, 35 Misc.3d. 235, 935 N.Y.S.2d 829 (Sup. Ct. N.Y. Co. 2011). And the third case involved not discovery but a motion to compel delivery of attached property located

13

abroad at foreign bank branches. <u>Samsun Logix Corp. v. Bank of China</u>, 31 Misc.2d. 1226(A), 929 N.Y.S.2d 202 (Sup. Ct. N.Y. Co. 2011).

2) Justice Coin stated that she was not inclined to assist a plaintiff of foreign nationality who had obtained a judgment from a foreign court which was then registered in the United States initially in Maryland and subsequently in New York. Here, in contrast, there is no undercurrent of *forum non conveniens*. CEIR is a Delaware limited liability company located in Connecticut and controlled by a New York equity investor, the parties agreed to arbitrate in New York under New York law, an interim award was made for provisional relief in New York that was enforced by this Court, and a contempt judgment ensued when Respondent Yeap Soon Sit did not comply. The merits hearing in the arbitration was held in New York in January, and a made-in-New York final award is awaited.

3) Justice Coin expressed serious doubts as to the bona fides of Plaintiff's certification that Plaintiff reasonably believed the judgment debtor had accounts at the defendant banks. In this case, however, there is no dispute about Respondents' extensive banking relationships with Deutsche Bank AG.

4) Justice Coin in essence agreed that New York's separate entity rule is applied only where the application is for "an order directing affirmative action as to the sought-after assets," (i.e. the order compels international movement of assets, not information) but she opted not to enforce the subpoena because the "*ultimate goal*" of attachment and turnover "*is unavailable in this jurisdiction.*" But that reasoning is not persuasive, essentially for the reasons given in <u>Gavilan</u> that were endorsed (by implication, as <u>Gavilan</u> was cited) by Judge Hellerstein in <u>Eitzen</u>. The requested discovery may materially assist CEIR with enforcement of the judgments in favor of the Court, and judgments enforcing the Final Award, in the courts of the various places where

Yeap Soon Sit may have assets including Thailand, Cayman Islands, Canada, and Singapore. Second, the time for decision on the continued vitality of the "separate entity rule" in regard to Deutsche Bank is when and if a turnover order is sought in this Court, not now.   Given the uncertainty after Koehler, it is not a foregone conclusion that the "separate entity rule,"  if it is intact today, will still be intact three or six months from now.

5) Justice Coin considered that her judgment was constrained by "a nearly mandatory rule of comity" in the courts of New York State requiring that plaintiff seek information from a non-party located in a foreign country "through that country's discovery processes or through the Hague Convention." But  there is no such "near mandatory" rule in the federal courts, and as we show in the next section of this brief, DB's position that that CEIR should proceed under the Hague Evidence Convention in Singapore is unpersuasive.


To summarize on this point:  There is no clear *stare decisis* basis in New York law for applying the separate entity rule to bar enforcement of a post-judgment subpoena *duces tecum* seeking information held by a foreign branch of a global bank that is jurisdictionally present in New York.  The "separate entity rule" is itself a relic of a different era of international banking than the one in which Deutsche Bank now thrives as a global financial powerhouse leveraging the seamless and instantaneous electronic transmission of data and funds.  But even if the separate entity rule is still with us, which is a matter of debate in the post-Koehler case law, it is not a rule that prevents enforcement of post-judgment subpoenas for documents held abroad -- such a rule would be contrary to the intent of the New York Legislature in the 2006 amendment of CPLR 5224 (a)(1), which made it clear that post-judgment subpoenas in aid of execution are intended to

reach information held outside New York and did not mention any carve-out for multinational banks.

## POINT II

### CEIR SHOULD NOT BE REQUIRED TO SEEK THIS DISCOVERY IN SINGAPORE THROUGH A LETTER OF REQUEST UNDER THE HAGUE EVIDENCE CONVENTION

The Second Circuit most recently addressed the question of when a district court should issue a production order for documents located abroad, despite a claim that production would violate foreign law, in Linde v. Arab Bank PLC, 706 F.3d 92 (2d Cir.  Jan. 18, 2013). Linde did not involve the Hague Evidence Convention[8], but the principles stated are relevant where the choice between subpoena enforcement and consignment to the Hague process is presented. The leading Second Circuit case on the choice between ordering production and ordering resort to the Hague Evidence Convention appears to be First American Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998).  The standards articulated in the two cases are similar and overlapping.

The Court in Linde observed that in the two leading Supreme Court decisions[9], "the Court held that the operation of foreign law 'do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may

---

[8] The full text of the Convention in PDF format is found at http://www.hcch.net/index_en.php?act=conventions.text&cid=82 (last visited April 11, 2013).

[9] Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court, 482 U.S. 522,  107 S. Ct. 2542 (1987);  Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 78 S.Ct.1087 (1958).

violate that [law] .'", and that "[u]ltimately the District Court possesses wide discretion to proceed in whatever manner it deems most effective.'" Further, stated the Second Circuit in <u>Linde</u>, continuing its synopsis of Supreme Court doctrine, "[i]n exercising that discretion where, as here, a party claims the foreign law prevents disclosure, the [Supreme] Court has called for a 'particularized analysis,". . . and endorsed factors recognized in a draft of what is now § 442(2)(b) of the Restatement (Third) of Foreign Relations Law of the United States as 'relevant to [such] analysis." 706 F.2d at 109.

The Court in <u>Linde</u> then proceeded to recite the Restatement Section 442 factors: "the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the requests; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the requests would undermine important interests of the United States, or compliance with the requests would undermine important interests of the state where the information is located.'" Id. at 109-10.

As to the use of the Hague Evidence Convention as an alternative to enforcement of a Rule 45 subpoena, the Second Circuit in <u>First American</u> stated the following principles and relevant factors (154 F.3d at 21-22):

1) "The Hague Convention is not the exclusive means for obtaining discovery from a foreign entity...[n]or is the Convention necessarily the means of first resort."

2) The Court declined the invitation to adopt a rule that "primary resort to the Hague Convention. ...should be mandatory if the demand for discovery is addressed to a non-party witness."

3) But the Court agreed the party v. non-party status of the party resisting discovery is relevant to international comity analysis.

4) The Court recited with evident approval the factors that had been considered by the District Court (Judge Sweet), which in turn had been adopted from the decision of Judge Lasker in Minpeco S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987): "(i) the competing interests of the nations whose laws are in conflict; (ii) the hardship that compliance would impose on the party from whom discovery is sought; (iii) the importance to the litigation of the information and documents requested; and (iv) the good faith of the party resisting discovery."

****

Before we discuss the application of these factors to the present case, we pause to discuss briefly where the burden of persuasion lies. It is settled law that "a party seeking the application of the Hague Convention procedures, rather than the Federal Rules of Civil Procedure, bears the burden of persuasion." Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 435 (E.D.N.Y. 2008) (Judge Matsumoto). *Accord*, In re Vivendi Universal, S.A., Securities Litigation, 2006 WL 3378115 at *2 (S.D.N.Y. Nov. 16, 2006) (Magistrate Judge Pitman) (citing cases) ("The party seeking to displace the Federal Rules of Civil Procedure in favor of the Hague Convention bears the burden of demonstrating that it is more appropriate for the Court to follow the Hague Convention"). In view of that allocation of the burden to DB, DB should have been the movant on this motion seeking a protective order, and CEIR should not have had to bear in the first instance the burden and expense of a motion to compel. The fact that CEIR made a motion to compel -- having no option to move the matter forward otherwise --  does not shift the burden of persuasion and

18

should not mean that CEIR must go to the expense of present expert testimony concerning the Singapore Banking Law secrecy provisions and Singapore's track record on enforcement of Hague Evidence Convention requests, before it knows what the specific position of DB in that regard may be. Thus we rely, at this stage, on publicly available information, and reserve the submission of expert testimony about Singapore law and Singapore Hague Convention practice until such time as DB presents its evidence, at which time CEIR should have a right of reply to what should have been DB's motion for a protective order.

**DB's Status Weighs In Favor of Permitting U.S. Discovery**

Several facets of Deutsche Bank's status are relevant to the international comity analysis, and they all point in the direction of enforcement of the subpoena. Deutsche Bank is not State-owned in its home jurisdiction; its home jurisdiction is any event is not Singapore; and it is one of the most "American" of the large foreign banks operating widely in the United States. Its stock has been publicly traded on the New York Stock Exchange since 2001, which was two years after DB greatly expanded its U.S. operation by acquiring Bankers Trust Company which itself had just prior to that acquired the Alex Brown investment banking firm. (https://www.db.com/usa/content/en/history.html)(last visited April 7, 2013). Further, a search on this Court's ECF system indicates that DB is a party to at least 100 open cases, more than a dozen of them as Plaintiff.

Further, based on its relationships with Respondents and role in the underlying arbitration, DB is not a prototypical non-party. See Goldstein Declaration at paragraphs 10-23. Without

minimizing the import of the particulars set forth in the Goldstein Declaration, here we note by way of illustration that:  Yeap Soon Sit used DB's "Global Trust Solutions" unit to organize the business entity that he used for the commercial transaction with CEIR in 2011. That entity is Respondent TTI. When TTI was established in 2004, a wholly-owned nominee company of DB called Regula Ltd. was appointed the "Sole Director" of TTI. Regula was wholly-owned by Deutsche Bank International Trust Ltd.  ("DBIT"). In 2009, YSS (i) created the YSS Trust and named DBIT as Trustee, and (ii) transferred beneficial ownership of the shares of TTI from himself to the YSS Trust.  TTI, like YSS, and like the dissolved entity S.A. Minerals with which CEIR initially contracted, maintained its bank account at the DB branch in Singapore. TTI's DB account statements were addressed to TTI in care of DBIT at DBIT offices in the Channel Islands and in Mauritius. During the arbitration, CEIR determined via discovery authorized by the Grand Court of the Cayman Islands that the YSS Trust kept its assets in TTI's account at the DB Singapore branch, and that when funds were transferred from TTI's account to YSS personal accounts at DB (and other banks), DBIT as Trustee of the YSS Trust created "Resolutions" that purported to authorize those transfers as distributions of the assets of the Trust.

When an issue arose in the arbitration, in January 2013, about whether TTI's bank account could be used to pay fees to TTI's US counsel as an exception to the freezing/Mareva orders, counsel produced its invoices -- which showed that client as identified in Moses & Singer's internal accounts is Deutsche Bank. And in the post-hearing briefing, Moses & Singer for TTI, arguing against the position that TTI is the alter ego of YSS, asserted that TTI is an affiliate of Deutsche Bank.

The only persons who gave written or oral testimony for Respondents in the arbitration, other than YSS who provided only written witness statements, were employees of DBIT.  Respondents produced in the discovery phase of the arbitration the DB Singapore branch account records of TTI -- and did not raise the Singapore Banking Law as an obstacle to production. DBIT created TTI unaudited financial statements based on the account records at the Singapore branch, and Respondents produced them -- without mention of the Singapore Banking Law.

Thus DB is far more than a bystander holding assets of a judgment debtor in a foreign account. What the arbitration record shows, in essence, is that DB's wealth management services unit provided structures to YSS that he used to do business with CEIR in 2011 in the transaction that is central to the case, and that the structures DB provided further provided for DB to have roles in the governance and record keeping and financial reporting of those entities.

For purposes of comity analysis, these facts show that DB has no particular association with Singapore that logically entitles DB to claim that its obligations in this matter should be determined by through Singapore's legal system not that of the United States. The arbitration award of October 2012 that underlies this Court's subject matter jurisdiction included a finding that TTI, the company whose Sole Director is a DB-owned nominee entity called Regula, is the alter ego of YSS, and that finding became *res judicata* for purposes of proceedings relating to the interim award when the award was confirmed last December. TTI as YSS's alter ego consented to arbitrate disputes in New York under New York law and therefore consented to personal jurisdiction in New York for judicial proceedings related to the arbitration.  Further, DB's customer relationship with YSS is not Singapore-centered to such an extent that any legitimate

21

expectations are defeated by a determination of disclosure obligations in a U.S. rather than a Singapore Court. YSS is a Thai citizen and resident, and the holder of a Canadian passport who owns multiple real properties in Vancouver one of which he calls his residence. DB helped YSS set up and then maintain TTI as a British Virgin Islands company with a British Virgin Islands incorporated DB affiliate, Regula, as its Sole Director. DB hosted TTI at its DBIT/DBIL offices in Guernsey and Mauritius (in the sense of permitting TTI to hold itself out as having its registered address at those locations). DBIT in the Cayman Islands has acted as Trustee of the YSS Trust, a Cayman Islands trust, since 2009 -- and CEIR was made to bear considerable legal expense to obtain information about the YSS Trust and TTI in proceedings in the Cayman Islands courts relating to the Cayman Islands Confidential Relationships Preservation Law.

In summary, there is nothing about the way DB has organized its global banking business generally, or its relationships with Respondents in particular, that legitimates any possible claim by DB to an expectation that Singapore rather than U.S. courts will determine its obligations to provide discovery in regard to its customer's obligations as a contempt judgment debtor toward the United States as a contempt judgment creditor.

**Importance of the Documents Requested**

For the contempt judgments to be enforced, and for the eventual expected Final Award to be enforced, disclosure of YSS's financial position as known to DB will be necessary. The near impossibility of getting information directly from YSS is already established. He absented himself from the arbitration. He failed to appear in these proceedings, declining to instruct his arbitration counsel to enter an appearance. He ignored the discovery propounded pursuant to the December 20, 2012 Order to Show Cause. He failed to appear for depositions in Vancouver, on

22

the same date, in the U.S. and Canadian enforcement proceedings. The Supreme Court of British Columbia, like this Court, entered a contempt judgment against YSS and ordered daily accruing fines and coercive civil confinement. YSS has evidently avoided confinement by not entering the United States or Canada. CEIR has not yet taken steps, although it could, to have YSS held in contempt in Singapore, where he has ignored the Mareva order entered in September 2012 and ignored the judgment enforcing the Arbitrator's interim award. But it is evident that further contempt judgments will have no coercive effect unless YSS's assets are pinned down with precise details of their location so that they may be subjected to lawful coercive seizure.

DB is or at least was the hub of YSS's financial network. YSS through Singapore counsel (whom he has since terminated) reported that his personal account at DB Singapore was closed in 2011, and CEIR does not know what was done with the funds that were in the account at the time of closing and the bank account records would reveal this. After great effort and expense CEIR discovered that all of the cash assets of the YSS Trust were held in the TTI bank account at the DB Singapore Branch and that, ostensibly on the same day in September 2012 that the British Columbia Mareva orders was granted, and two business days before the Singapore Mareva order was granted, those assets were transferred to an account at DB Singapore in the name of Starplex International. Starplex International is an entity CEIR knows nothing about. CEIR is entitled to know if it is a proxy for YSS. CEIR is entitled to know if the transfer was made in violation of the Canadian and Singapore Mareva Orders, not by coincidence and good fortune on the day or two days before they took effect. CEIR is entitled to know if there are more YSS proxy accounts like Starplex, through which YSS is enabled to conceal his assets and avoid their application to satisfy the contempt judgments, the judgments enforcing the interim award, and the eventual anticipated Final Award. CEIR is entitled to know what DB knows about YSS's

23

assets, as it is evident that DB does have such knowledge and it is evident that YSS has not and will not truthfully disclose them, even in response to the severe contempt penalties that this Court and the Supreme Court of British Columbia have imposed on him.

**The Degree of Specificity of The Requests**

DB has not communicated to CEIR through its outside counsel that it objects to the subpoena on the basis of lack of specificity in the requests. Further, the subpoena contains only 13 categories of Requests, and is specific where specificity is possible, including the naming of accounts by account number where known, real property by address where the address is known, and a life insurance policy by the known insurance policy number. The difficulty with proceeding under the Hague Evidence Convention in Singapore, however, is that the Requests include categories that would not meet the "particular documents" standard that Singapore has opted to apply under Article 23 of the Hague Convention.[10]  CEIR knows that YSS has been a provider of collateral and a personal guarantee to DB in connection with a credit facility made available to TTI in January 2012, and in correspondence with CEIR that is part of the record in the arbitration YSS represented that he and/or S.A. Minerals had from earlier dates very substantial lines of credit through DB. It therefore is entirely reasonable to suppose that the Bank received considerable documentation from YSS about his assets, but CEIR is not in a position to ask for "particular documents" in this respect because it does not know what the particular documents may be, and its efforts to secure greater particularity be taking a deposition of YSS were blocked by his

---

[10] Singapore's reservations in adopting the Hague Evidence Convention are found at Goldstein Decl. Exhibit C: and at http://www.hcch.net/index_en.php?act=status.comment&csid=569&disp=resdn (last visited April 17, 2013).

contumacious failure to appear.    Thus there are several categories of requests for "documents concerning" e.g., Starplex International, two residential addresses in Singapore known by CEIR to be associated with YSS and his domestic partner, and a Singapore entity at one of those addresses that may be associated with a luxury water craft owned by YSS ( a fact known to CEIR through the commercial relationship).    In sum these are not "blunderbuss" document requests; CEIR has taken the information known to it about YSS's assets and formulated its requests with the specificity that is possible without sacrificing legitimate scope for disclosure.

**Whether the Information Originated In The United States**

It is conceded that the information sought did not originate in the United States.

**Availability of Alternative Means to Obtain the Information**

It is evident the information cannot be obtained from YSS himself. The questions is whether there is a reasonably practicable way to obtain the information from DB in Singapore.    The solution of using the Hague Evidence Convention is not acceptable, according to the available information which indicates (i) that processing time for a document request could be six to 12 months[11], and (ii) the Singapore Court would only enforce the requests for "particular documents" when there is a practical need to broader scope in view of the unavailability of YSS to answer questions.    The provisional relief that was obtained in this case, beginning with the Emergency Arbitrator's Award in August 2012, continuing with the Mareva relief in Singapore and Canada in September 2012, the Arbitrator's Interim Award in October 2012, and the Cayman

---

[11] See Singapore's Response to a questionnaire from the Hague Conference on Private International Law, found at Goldstein Decl. Exhibit B and at http://www.hcch.net/index_en.php?act=publications.details&pid=4381&dtid=33 (last visited April 17, 2013).

Islands Mareva order in November 2012, was that there was a serious risk of dissipation of assets inferable from YSS's course of conduct in his dealings with CEIR. Each of these courts and Arbitrators accepted that. The non-compliance with the Mareva orders and judgment enforcing the Arbitrator's Interim Award, and non-response to the contempt judgments, and the disclosure of the wholesale transfer of the YSS Trust cash assets to an entity called Starplex on supposedly the last business day before the first Mareva order, reinforces the scenario of ongoing dissipation of assets in conscious disregard of CEIR's rights and the rightful authority of courts and arbitrators. For DB to assert, as it does, that CEIR should use the Hague Evidence Convention, amounts to a plea for delay on behalf of its customer that would simply facilitate more concealment and more dissipation.

**Noncompliance Would Undermine Important Interests of the United States <u>and</u> Singapore**

Non-compliance by DB undermines the U.S. interests in vindication of the authority of U.S. courts over persons who have consented to U.S. judicial jurisdiction but then ignore the judgments and orders of those courts. That consideration would be true in every case of non-compliance with a civil contempt judgment. But this case is special because it arises from an arbitral award governed by (and enforced under) the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), which treaty is implemented by Chapter Two of the Federal Arbitration Act (9 U.S.C. § 201 *et seq.* )which is the source of this Court's subject matter jurisdiction in this case. Enforcement of awards under the New York Convention is an important public policy of the United States and of the more than 130 nations that are Members States of the Convention, including Singapore, whose High Court has also recognized the Interim Award, and Germany where DB has its home office.

26

As to "competing interests" of the U.S. and Singapore, they are limited to the difference in approach to document discovery that is reflected in Singapore's adoption of the Hague Evidence Convention with the reservation in Article 23 that it will not be enforced for "pre-trial discovery" and that requests for "particular documents" will be required.  But given that Singapore's High Court has already recognized the Arbitrator's interim award, it is doubtful whether Singapore would consider that its sovereignty has been infringed or its interest impaired in any meaningful way if a global bank that is not a Singapore national, DB, is required to provide "American Style" discovery in aid of execution of a contempt judgment calculated to coerce compliance with an arbitral award the Singapore court has recognized.

As to the Singapore Banking Act's secrecy provisions and the exemptions in the Third Schedule thereof, it is evident from the categories of exemptions that Singapore has struck a public policy balance in favor of disclosure, and against bank secrecy, where (i) disclosure is to facilitate collection of a judgment against the Bank's customer (the garnishee order exception), (ii) disclosure is to facilitate investigation or prosecution of wrongdoing (the "offense" exception), and (iii) disclosure is found to be needed for special cause shown, in the discretion of the Court in civil proceedings (the "banker's books" exception).   Disclosure under this subpoena is consistent with, not at odds with, the policies indicated by the Singapore Banking Act -- whether or not disclosure here would fall within the technical confines of those exceptions.

**Whether Compliance Would Impose Any Hardship on DB**

Compliance with this subpoena imposes no practical hardship on DB. It involves the accounts of effectively one customer, YSS, who has had multiple accounts under different names but has essentially dealt with DB from an account location perspective through one branch, the

Singapore Branch, and one relationship manager at that Branch whose name appears on many of the Bank-originated documents that have been produced in this case. CEIR knows that the Bank has an in-house legal team all over the world, including attorneys in Singapore who have been addressees and writers of correspondence with CEIR's Singapore counsel, who are well-equipped to assist the relationship manager in gathering up the responsive documents and sending them along to New York. The volume of the documents is presumably not large and presumably can be transmitted via e mail as have the documents the Bank has already produced from the Singapore Branch. But the important consideration is that essentially only one source needs to be consulted -- the Singapore Branch relationship manager, in order to gather all responsive documents. *Cf.* Jones v. Deutsche Bank AG, 2006 WL 648369 at *4 (N.D. Cal. Mar. 10, 2006) (denying DB request that discovery of documents be required to proceed under Hague Evidence Convention rather than Federal Rules where DB was only required to search offices in UK and Germany not worldwide, and bank failed to show "how the limited document production at issue here, to consist of production of its own documents from its own offices, would seriously impair the sovereign interests of other nations").

As to "legal hardship" measured by the risk that the Bank would be prosecuted and punished for violating the secrecy provisions of the Singapore Banking Law, so far the Bank has made no submission concerning the extent of that risk except to refer to the text of the Law. CEIR doubts that, in the circumstances of this case, DB would face prosecution and penalty for compliance with an order of this Court directing disclosure, when DB admits that a Singapore judge has power and discretion to order disclosure and that compliance with a Singapore judge's order would entail no secrecy violation. CEIR awaits DB's submissions in this regard, and will address them in reply. Whereas the burden of showing that the Hague Evidence Convention instead of

the Federal Rules should be used is on the party invoking the Hague Evidence Convention, CEIR believes it is not required to present expert testimony about prosecutorial discretion under the Singapore Banking Law until and unless DB presents evidence in this regard. *See* Gucci America, Inc. v. Weixing Li, 2011 WL 6156936 at \*11 (S.D.N.Y. Aug. 23, 2011) (Judge Sullivan) (subpoena to Bank of China enforced and resort to Hague Evidence Convention not required where, inter alia, Bank of China failed to demonstrate substantial risk that sanctions would be imposed for compliance under China's bank secrecy laws).

## DB's "Good Faith" and Motivations for Its Position

We do not suggest that DB is proceeding in bad faith.  We do, however, believe that DB is taking the position it takes because as a matter of business practice to maintain the goodwill of its customers it will assert positions that are to the procedural advantage of its customers until and unless DB must comply with a court order. Were the situation otherwise, DB and CEIR could have agreed to make a joint application to a Singapore High Court judge for an order declaring that compliance with the U.S. Court's subpoena would not violate the secrecy provisions of the Singapore Banking Law. We do not believe that DB or its counsel find substantial merit in the positions DB is taking here, but that DB considers itself duty-bound as a matter of customer relations to articulate that position as best they can and not to provide compliance voluntarily. DB's position is not frivolous, but it lacks substantial merit.

## **Conclusion**

CEIR'S motion to compel should be granted and DB should be ordered to comply with the subpoena.

Dated: New York, New York

April 17, 2013

Respectfully submitted,

MARC J. GOLDSTEIN LITIGATION & ARBITRATION CHAMBERS

By: _____

Marc J. Goldstein (MG-8701)

1230 Avenue of the Americas, 7th Floor

New York, New York 10020

(212) 799-8605

Attorney for Movant