UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__ 6/11/2013 __
```

-------------------------------------------------------------------X

CE INTERNATIONAL RESOURCES HOLDINGS,
LLC,

                                        **Petitioner,**          12-CV-08087 (CM)(SN)

                                                              <u>**MEMORANDUM AND ORDER**</u>

            -against-

**S.A. MINERALS LTD PARTNERSHIP, et al.,**

                                        **Respondents.**

-------------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge.**

            Petitioner CE International Resources Holdings, LLC ("CEIR") moves, pursuant to

Federal Rule of Civil Procedure 45 and New York's Civil Practice Law and Rules ("CPLR")

5224, for an order to compel Deutche Bank AG ("Deutsche Bank") to comply with a subpoena

*duces tecum* for documents held in its Singapore branch. The subpoena was served on February

11, 2013 in connection with CEIR's efforts to enforce a judgment relating to an arbitral

proceeding between and among petitioner CEIR and respondents Yeap Soon Sit, Tantalum

Technologies, Inc., and S.A. Minerals Ltd. Partnership (collectively, "Respondents"). Deutsche

Bank has objected to the subpoena on the grounds that disclosure of the desired information

would violate Singapore's Banking Act, subjecting Deutsche Bank's employees to possible

sanctions, and that enforcement of the subpoena would violate New York's "separate entity

rule." CEIR moved to compel.

            Because an international comity analysis weighs in favor of CEIR proceeding through

alternative avenues to secure the information it seeks, CEIR's motion is DENIED.

1

## BACKGROUND

### I.  The Arbitration Proceeding

The Court presumes the parties' familiarity with the relevant facts in this protracted litigation. Only those facts essential to the resolution of this motion are discussed here.

On July 2, 2012, CEIR commenced arbitration at the International Centre for Dispute Resolution against respondents S.A. Minerals Ltd. Partnership ("S.A. Minerals") and Tantalum Technology, Inc. ("Tantalum"). (May 24, 2013 Decision of the Arbitral Tribunal, ("Arb. Dec.") ¶ 1.) CEIR alleged a breach of two contracts for the purchase and sale of synthetic concentrates between CEIR and S.A. Minerals and Tantalum in 2009 and 2011, respectively. (Id. ¶ 2.) CEIR subsequently learned that S.A. Minerals had dissolved the previous year, so it amended the Statement of Claim to add Yeap Soon Sit ("Mr. Yeap") on the theories that Mr. Yeap is a successor to S.A. Minerals, and that S.A. Minerals and Tantalum are the alter egos of Mr. Yeap. (Id. ¶ 5.) CEIR asserted the same claims against Mr. Yeap as it had in the first Statement of Claim, and added a claim for wrongful and tortuous acts. (Id.)

On July 13, 2012, CEIR applied for interim relief from an Emergency Arbitrator, which was granted on August 9, 2012. (Id. ¶¶ 6, 10.) The Interim Award provided that S.A. Minerals and Mr. Yeap were to provide CEIR with written information about the goods for which the parties had contracted. (Id. ¶ 10.) The respondents did not comply with the Interim Award. (Id. ¶ 11.)

Presumably out of concern that any judgment issued against Mr. Yeap may not be satisfied, CEIR has moved for various forms of interim relief in several other forums. On September 14, 2012, CEIR obtained a freezing order from the Supreme Court of British Columbia, Canada in respect to Mr. Yeap's assets up to $10 million (a so-called "Mareva

2

injunction," see Mareva Compania Naviera S.A. v. International Bulkcarriers S.A., 2 Lloyd's

Rep. 509 (1975)). (Arb. Dec. ¶ 13.) On September 18, 2012, the High Court of the Republic of

Singapore (the "Singapore High Court" or "High Court") entered an order restraining

respondent's assets up to $7 million. (Id. ¶ 14; Declaration of Harpreet Singh Nehal ("Singh

Decl.") ¶ 31.)

 CEIR also applied to the Arbitrator for interim measures and, on October 26, 2012, the

Arbitrator issued an interim award, directing Respondents to provide security in the amount of

$10 million and enjoined Respondents from transferring any assets, wherever located, up to the

amount of $10 million until and unless such security was provided. (Arb. Dec. ¶¶ 20-21.)

 On November 30, 2012, CEIR obtained a disclosure order from the High Court, which

allowed CEIR access to the banker's books of Deutsche Bank AG Singapore that related to any

account held by respondent S.A. Minerals. (Singh Decl., Ex. 5 ("High Court Disclosure

Order").) Finally, on December 6, 2012, the High Court entered a judgment confirming the

Arbitrator's October 26, 2012 interim award. (Singh Decl., Ex. 6 ("High Court Interim Award

Order").)

 On May 24, 2013, the Arbitral Tribunal rendered a fully favorable decision to CEIR.

(Arb. Dec. ¶¶ 63-69.) The Final Award allowed 30 days for the Respondents to complete

specific performance of the goods.  (Id. ¶ 72.) In the alternative, CEIR was awarded

$7,583,161.74 payable by S.A. Minerals and Mr. Yeap jointly; $8,055,000 by Tantalum and Mr.

Yeap jointly; pre-judgment interest of $1,253,270.00 and post-judgment interest of nine percent

per annum; as well as full costs and legal fees. (Id. ¶¶ 71-76.)

## II.    Federal Litigation

CEIR's litigation in this Court began on November 7, 2012, when it moved to confirm the October 26, 2012 interim award and obtain an entry of judgment. (Docket No. 1.) On December 10, 2012, the Honorable Colleen McMahon granted CEIR's application for enforcement of the interim arbitral award. (Docket No. 23.) On December 12, 2012, the Clerk of Court entered a judgment in accordance with that Decision and Order. (Docket No. 24.) The Court ordered Mr. Yeap and Tantalum Tantalum to post $10 million as security for the eventual final award, and provided for the freezing of Mr. Yeap and Tantalum's assets up to $10 million if he did not post the security. (Id.)

Mr. Yeap did not comply with the Order and, on December 19, 2012, CEIR moved for contempt sanctions against Mr. Yeap. (Docket No. 26.) On January 24, 2013, Judge McMahon issued a Decision and Order holding Mr. Yeap in contempt and fining him $5,000 per business day for the 20 business days that followed the order and thereafter at a rate of $20,000 per business days. (Docket No. 40.) As part of this order, Judge McMahon directed that CEIR "may enter judgment in favor of the Clerk of Court from time to time for the accrued amounts of such fines and enforce such judgment on behalf of the Court." (She also ordered the arrest and civil commitment of Mr. Yeap.) Accordingly, on February 8, 2013, the Court entered a money judgment in favor of the United States against Mr. Yeap for $50,000 of accrued civil contempt fines to be paid to the Clerk of Court. (Docket No. 41.) Upon application from CEIR, on April 8, 2013, the Court entered a second judgment for accrued civil contempt fines in the amount of $670,000 against Mr. Yeap and in favor of the United States. (Docket No. 48.) Thus, Mr. Yeap has unsatisfied judgments to the United States for accrued contempt fines in the amount of $720,000.

III.    **Subpoena** *Duces Tecum*

To date, Mr. Yeap continues to evade enforcement of the Final Award and federal court judgments. To assist in locating Mr. Yeap's assets, on February 11, 2013, CEIR served a subpoena *duces tecum* pursuant to Federal Rule of Civil Procedure 45 on Deutsche Bank AG in New York City. (Declaration of Marc Goldstein ("Goldstein Decl."), Ex. A (the "Subpoena").) CEIR seeks documents that it believes are in the possession of Deutsche Bank's Singapore branch, where Mr. Yeap and Tantalum are customers, which may disclose the location of Mr. Yeap's assets for purposes of attachment.

The subpoena provides a list of 13 categories of documents CEIR seeks in connection with Mr. Yeap, entities that he allegedly controls, and accounts he (or those companies) may hold within any branch of DB. Specifically, CEIR requests:

(1) All communications between Deutsche Bank AG and Yeap Soon Sit from December 1, 2011 to the present.

(2) All communications between the Deutsche Bank and any person concerning the assets and/or liabilities of Yeap Soon Sit from December 1, 2011 to the present.

(3) All communications within Deutsche Bank and/or between Deutsche Bank and any affiliate or subsidiary or division of the Bank including but not limited to Deutsche Bank International Trust Co. (Cayman) Limited concerning assets and/or liabilities of Yeap Soon Sit from December 1, 2011 to the present.

(4) All communications between Deutsche Bank and any person concerning any of the following cases that involved the Plaintiff and Respondents in this matter as parties: (i) the Interim Award in the American Arbitration Association Case No. 50-503-T-00481-12, dated October 26, 2012; (ii) case in the High Court of Singapore, Originating Summons No. 295 of 2012/Y; (iii) Case No. S126437 in the Supreme Court of British Columbia; and (iv) FSD Cause No. 161 of 2012 in the Grand Court of the Cayman Islands, Financial Services Division.

(5) All documents referring or relating to the legal or beneficial ownership of the residential property located at 24 Kheam Hock Road in Singapore.

(6) All documents referring or relating to the rights of possession and occupancy of Yeap Soon Sit or Anne Marie Cecile Croteau in the residential property located at 24 Kheam Hock Road in Singapore.

(7) All documents concerning Kingfisher Marine Pte Ltd., whose last known address is 11 Cove Drive Unit 02-02, Sentosa Cove One 15 Marina, Singapore.

(8) All documents concerning Starplex International Corporation.

(9) Documents sufficient to identify each and every account at Deutsche Bank presently existing or which existed in the past three years in the name of Yeap Soon Sit or in the name of any entity legally or beneficially owned in whole or in part by Yeap Soon Sit, or as to which Yeap Soon Sit is or was an authorized signatory.

(10) As to each account identified by the documents in response to #8, the account statements for the period December 1, 2011 to the present.

(11) Account statements and debit or credit advices with respect to Account [REDACTED] and [REDACTED] at the Singapore Branch of Deutsche Bank AG, and any successor account to these accounts, from May 9, 2009 to the present.

(12) Account statements and debit or credit advices with respect to Account [REDACTED] and [REDACTED] at the Singapore Branch of Deutsche Bank AG, and any successor account to these accounts, from May 9, 2009 to the present.

(13) All documents concerning Manulife Global Achiever Policy No. [REDACTED] from the Manufacturers Life Insurance Company.

As required under Federal Rule of Civil Procedure 45(c)(2)(B), counsel for Deutsche Bank sent a letter to counsel for CEIR objecting to the subpoena on at least nine grounds. These included the general objection that the information sought pertains to "confidential, personal or private, proprietary or sensitive business information, or information protected from disclosure by any law (including, but not limited to, foreign laws)." (Declaration of Andrew Hammond ("Hammond Decl."), Ex. 7.)

6

On April 17, 2013, CEIR moved in this Court for an order under Rule 37(a) compelling Deutsche Bank to comply with the subpoena. Deutsche Bank opposes the motion largely on the ground that compliance with the subpoena would violate Singapore's bank secrecy laws. Under an international comity analysis, Deutsche Bank argues, CEIR should be directed to obtain the information through available alternatives, including an application to the Singapore courts or through the Hague Evidence Convention. Deutsche Bank also argues that enforcement of the subpoena would violate New York's separate entity rule. CEIR contends that neither an order from the Singapore courts nor an application under the Hague Evidence Convention is a viable alternative to timely obtaining the full set of information it seeks by way of subpoena. It further argues that the separate entity rule does not apply in non-attachment contexts.

## DISCUSSION

I.   **Legal Standards of Post-Judgment Discovery**

"[B]road post-judgment discovery in aid of execution is the norm in federal and New York state courts." EM Ltd. v. Republic of Argentina, 695 F.3d 201, 207 (2d Cir. 2012). Post-judgment discovery is governed by Federal Rule of Civil Procedure 69, which provides that, "[i]n aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2). "It is not uncommon to seek asset discovery from third parties, including banks, that possess information pertaining to the judgment debtor's assets." EM Ltd., 695 F.3d at 207; accord Fed. R. Civ. P. 69(a)(2) (permitting discovery "from any person"). "Nor is it unusual for the judgment creditor to seek disclosure related to assets held outside the jurisdiction of the court where the discovery request is made." EM Ltd., 695 F.3d at 207.

New York's CPLR article 52, which governs the enforcement of money judgments, has "a similarly broad sweep." Id. at 207. CPLR 5224, which applies in federal court through Fed. R. Civ. P. 69(a)(1), identifies several devices to aid in the enforcement of a judgment. One such device is through the use of a subpoena *duces tecum*. CPLR 5224(a)(2) provides that a subpoena may be served "requiring the production of books and papers for examination at a time and place named therein." Further, CPLR 5224(a–1), an amendment enacted in 2006, establishes the extraterritorial reach of a subpoena *duces tecum*, subjecting a corporation to "the full disclosure prescribed by [CPLR § 5223] whether the materials sought are in the possession, custody or control of the [corporation] within or without the state." See Eitzen Bulk A/S v. Bank of India, 827 F. Supp. 2d 234, 238 (S.D.N.Y. 2011) ("Under New York law, a subpoena *duces tecum* served on a corporation doing business or licensed to do business in New York reaches all responsive materials within the corporation's control, even if those materials are located outside New York."). See generally David D. Seigel, New York Practice § 509 (5th ed. 2011) (out-of-state materials may be secured by a subpoena *duces tecum* so long as the person controlling the materials is subject to *in personam* jurisdiction in New York).

## II.   International Comity

Citing certain provisions of Singapore's Banking Act that prohibit disclosure of customer information, Deutsche Bank asserts that CEIR has placed it in the "untenable position of either complying with [the subpoena] or suffering civil fines and exposing Deutsche Bank's employees to potential imprisonment in Singapore." (Deutsche Bank's Opposition ("Opp.") at 3.) It asks this Court to deny CEIR's motion to compel and direct it to other means of obtaining this information. CEIR argues that the information sought here falls under certain exceptions to the confidentiality provisions in Singapore's Banking Act, and, in the alternative, an

international comity analysis favors enforcing the subpoena under New York law because no viable alternatives exist.

## A. Conflict of Laws

"[T]he threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law." Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa, 482 U.S. 522, 555 (1987). Deutsche Bank has offered the expert opinion of Harpreet Singh Nehal, the Managing Partner of Cavenagh Law LLP, a boutique Singapore law firm, which is in formal alliance with Clifford Chance.[1] (Singh Decl. ¶ 1.) Mr. Singh describes the Singapore Banking Act, including its rules governing the disclosure of customer account information.

Under Rule 44.1 of the Federal Rules of Civil Procedure, the determination of the effect of a foreign law presents a question of law for the Court which may "consider any relevant material or source" without regard to its admissibility under the Federal Rules of Evidence. Accord In re Euromepa, S.A., 154 F.3d 24, 28 n.2 (2d Cir. 1998). Among other sources, the Court may consider the opinions of experts, but it is not bound by their testimony, even if uncontradicted. Batruk v. Mitsubishi Motors Corp., 94 Civ. 7593, 8677 (KMW), 1998 WL 307383, at *3 (S.D.N.Y. June 19, 1998). "The party relying on foreign law has the burden of showing that such law actually bars [the] production" at issue. British Int'l Ins. Co. Ltd. v.

---

[1] Mr. Singh graduated "near the top" of his class in 1991 with an LL.B. (Honours) degree from the National University of Singapore and was admitted to the Singapore bar in 1992. In 1993, he graduated from Harvard Law School with an LLM degree. Upon graduation from Harvard, Mr. Singh was appointed as a Justice's Law Clerk of the Supreme Court of Singapore and clerked for the former Chief Justice. Since 1994, he has been engaged in private practice in Singapore and, in 2007, he was appointed as a Senior Counsel by the Chief Justice of Singapore, "a distinction reserved for advocates who have demonstrated top-tier advocacy skills, professional integrity and mastery of the law." (Singh Decl. ¶ 1.)

Seguros La Republica, S.A., 90 Civ. 2370 (JFK)(FM), 2000 WL 713057, at *8 (S.D.N.Y. June 2, 2000) (citing U.S. v. Vetco Inc., 691 F.2d 1281, 1289 (9th Cir. 1981)).

### 1. Singapore Banking Act

Singapore's banking regime is established under the Banking Act (Cap 19, 2008 Rev Ed). (Singh Decl. ¶ 8.) Section 47 of the Banking Act provides that "Customer information shall not, in any way, be disclosed by a bank in Singapore or any of its officers to any person except as expressly provided in this Act" (the "Nondisclosure Provision"). (Singh Decl. ¶ 9 & Ex. 14 (the "Banking Act.") The definition of a "bank in Singapore" includes, "in the case of a bank incorporated outside Singapore, the branches and offices of the bank located within Singapore." (Singh Decl. ¶15.) The law defines "customer information" broadly: it includes "any information relating to, or any particulars of, an account of a customer of the bank, whether the account is in respect of a loan, investment or any other type of transaction, but does not include any information that is not referable to any named customer or group of named customers; or (b) deposit information." Banking Act § 40A. (Singh Decl. ¶ 10.)

Section 47(6) of the Banking Act provides that an individual who violates the Nondisclosure Provision shall be guilty of an offense and will be liable for a fine of up to S$125,000 or imprisoned for up to three years, or both. Banking Act § 47(6). For all other offenders, a fine will be imposed of up to S$250,000. Id. (Singh Decl. ¶ 16.)

The subpoena *duces tecum* served on Deutsche Bank seeks documents concerning any accounts held by Mr. Yeap or companies he controls, and any communications concerning assets of Mr. Yeap or companies he controls. This is squarely "customer information" within the meaning of the Banking Act, and it is Deutsche Bank's Singapore branch ("a bank in Singapore") from which the information is requested. Thus, it appears that disclosure of the

information would violate Singapore's bank secrecy laws and, therefore Singapore law is in conflict with New York law.

## 2. Exceptions to the Banking Act

There are, however, various exceptions to the Nondisclosure Provisions. The Court considers only those that are advanced by CEIR and finds that none is applicable here.

First, disclosure is permitted where "necessary for compliance with an order of the Supreme Court or a Judge thereof pursuant to the powers conferred under Part IV of the Evidence Act (Cap. 97)." Third Schedule of the Banking Act (the "Banking Act Third Schedule") at ¶ 7. (See also Singh Decl. ¶ 21(g).) Deutsche Bank's expert submissions clarify that a "court" is defined solely as the High Court of Singapore and that, therefore, "under Singapore law, an order from a United States Court against Deutsche Bank to disclose information . . . does not fall within the exceptions to secrecy." (Singh Decl. ¶ 27.) CEIR argues that this section is applicable because the High Court of Singapore granted CEIR's application to compel Deutsche Bank to produce the account records of S.A. Minerals and its subpoena is "necessary for compliance" with that order. (See High Court Disclosure Order.) But this subpoena – unlike the High Court Disclosure Order – seeks information concerning account records of *Mr. Yeap* and therefore extends beyond the scope of the High Court Disclosure Order. CEIR cannot bootstrap its subpoena onto the High Court's prior order.

Second, disclosure is permitted where it is "necessary for compliance with a garnishee order served on the bank attaching moneys in the account of the customer." Banking Act Third Schedule at ¶ 6. (See also Singh Decl. ¶ 21(f).) CEIR contends that the High Court Interim Award Order and the December 10, 2012 Decision and Order from this Court enforcing the arbitrator's interim award, which required the freezing of Mr. Yeap's assets, are "garnishee

orders," and that, even if those judgments are not technically garnishee orders under the

Banking Act, the "effect of the delivery of those judgments to the Bank in Singapore . . . was

the same as a garnishee order." (Petitioner's Motion ("Pet. Motion") at 5.)

Order 49 of the Rules of Court governs garnishee orders and provides certain procedures

that must be followed before the High Court will issue a garnishee order. (Singh Decl. ¶ 57 &

Ex. 20 ("Order 49").) When a judgment creditor has a judgment or order for the payment of

money, she can apply to the High Court for an order directing the garnishee to pay the amount

due to the judgment creditor. Order 49. The order must be addressed to the intended garnishee,

here Deutsche Bank, and must contain certain information and follow specific procedures. Id.

The orders that CEIR cites fulfill none of the requirements set forth in Order 49: they are not

directed to Deutsche Bank, they do not direct payment to CEIR as the judgment creditor, and

CEIR does not present any evidence that they were obtained through the appropriate procedure

under Order 49, so the Court assumes that they were not. Therefore, these orders cannot be

considered a "garnishee order" under the meaning of this exception to the Nondisclosure

Provisions. And absent any legal support to do so, this Court will not deem it a garnishee order

simply because it may have a similar effect.

Third, disclosure is permitted where it is "necessary for compliance with an order or

request under any specified written law to furnish information, for the purposes of an

investigation or prosecution, of an offense alleged or suspected to have been committed under

any written law." Banking Act Third Schedule at ¶ 5(a). (See also Singh Decl. ¶ 60.) CEIR

argues that the subpoena *duces tecum* falls under this category under the plain language and "for

public policy" reasons. (Pet. Motion at 5-6). Deutsche Bank's expert clarifies that the reference

to "specified written law" applies only within the context of nine specific Singapore statutes

identified in Section 47 of the Banking Act, (Singh. Decl. ¶¶ 59-61), none of which apply here. Furthermore, any disclosure under this act is permissible only to certain persons: "police officer or public officer duly authorized under specific written law to carry out the investigation or prosecution." Banking Act Third Schedule at ¶ 5(a). CEIR does not fall under any of these categories and, therefore, cannot receive the information under this exception. Moreover, the Singapore High Court has made plain that the Banking Act "is now the exclusive regime governing banking secrecy in Singapore" and "that no customer information shall be disclosed by a bank in Singapore or any of its officers except as expressly provided for in the Banking Act." Susilawait v. American Express Bank Ltd [2009] 2 SLR(R) 737 at ¶ 67. Accordingly, this Court will not create a public policy exception not recognized under Singapore law.

The subpoena issued by CEIR does not fall under any of the exceptions to the strict Nondisclosure Provisions of the Banking Act. Therefore, compliance with the subpoena *duces tecum* requires Deutsche Bank to violate Singapore's laws. Accordingly, the Court finds that there is a true conflict between New York's CPLR 5224 and Singapore's Banking Act and therefore it must proceed to a comity analysis.

## B. Comity Analysis

International comity is "neither a matter of absolute obligation . . . nor of mere courtesy and good will," but is the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." In re Maxwell Commc'n Corp., 93 F.3d 1036, 1046-48 (2d Cir. 1996). It calls for a "particularized analysis of the respective interests of the foreign nation and the requesting nation." Aerospatiale, 482 U.S. at 543-44.

To guide this analysis, this Circuit employs the five-factor test set forth in the Restatement (Third) of the Foreign Relations Law of the United States § 442(1)(c). See, e.g., Tiffany (NJ) LLC v. Qi Andrew, et al., 276 F.R.D. 143 (2011) ("Qi Andrew"); Strauss v. Credit Lyonnais, 249 F.R.D. 429 (E.D.N.Y. 2008). This so-called "comity analysis" requires courts to consider (1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means to securing the information; and (5) the balance of national interests. Restatement (Third) Foreign Relations Law § 442(1)(c). As additional factors, courts may consider "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery." Gucci America, Inc. v. Weixing Li, 10 Civ. 4974 (RJS), 2011 WL 6156936, at *5 (S.D.N.Y. Aug. 23, 2011) ("Weixing Li") (citations omitted). The Court addresses each of these factors in turn.

### 1. Importance of the Documents to the Litigation

CEIR argues that, because "the near impossibility of getting information directly from [Mr. Yeap] is already established," disclosure of Mr. Yeap's financial position "as known to [Deutsche Bank]" will be "necessary" to collect on the award and the contempt judgments. (Pet. Motion. at 22.) In response, Deutsche Bank concedes that the information concerning accounts held by Mr. Yeap would be "relevant" to the enforcement of the February 8, 2013 judgment. (Opp. at 14.)

Because none of the comity factors is in itself dispositive, there is no specific requirement of how important a document must be to a litigation to compel production. Compare Milliken & Co. v. Bank of China, 758 F. Supp. 2d 238, 246 (S.D.N.Y. 2010) ("[T]he

information sought must be 'vital' to the litigation.") (quoting Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992)) with Reino de Espana, 03 Civ. 3573 (LTS)(RLE), 2005 WL 1813017, at *7 ("[T]he Court need only consider the relevancy of the requested documents.") (citation omitted). Instead, courts examine the role that the desired information plays in the action. For example, in Weixing Li, 2011 WL 6156936, at *6, the documents sought related to defendants' bank accounts were "important" in a trademark infringement action because they would assist in identifying additional infringers. Similarly, in Tiffany (NJ) LLC v. Forbse, 11 Civ. 4976 (NRB), 2012 WL 1918866, at *5 (S.D.N.Y. May 23, 2012) ("Forbse"), the documents sought were "highly important" to the litigation because they would allow plaintiffs to calculate defendants' profits in connection with the infringement and might enable plaintiffs to identify other infringers.

But establishing liability is not the only basis upon which courts have recognized the importance of the sought after documents. Pursuit of post-judgment asset discovery from bank accounts has also been considered "important" when the information is "critical to [the] ability to collect on [a] default judgment." British Int'l Ins., 2000 WL 713057, at *5, 9 ("[T]here is arguably no information concerning its financial situation which is of greater potential relevance to a judgment creditor than the identity and location of the debtor's assets."); see also Gucci America, Inc. v. Curveal Fashion, 09 Civ. 8458 (RJS)(THK), 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010) ("Curveal Fashion") (documents sought were "both relevant and vital to the litigation" because it would identify defendants assets and allow plaintiffs to enforce the default judgment).

In weighing the importance of the information sought, the Court also considers that CEIR has already obtained a disclosure order in Singapore allowing it to "inspect and take

copies of any entries of the banker's books of . . . Deutsche Bank AG Singapore . . . relating to

and/or in respect of any bank account held by S.A. Minerals Pte. Ltd." (High Court Disclosure

Order.) Thus, any information sought through the subpoena may already be available to CEIR

or might be obtained through a second disclosure order directed at Mr. Yeap's accounts.

Further, CEIR has the alternative of pursuing discovery through the Hague Evidence

Convention, discussed in more detail below. Where parties have other means of obtaining the

requested documents, courts consider the requested discovery to have a "reduced degree of

importance." Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 529 (S.D.N.Y.

1987).

With these considerations in mind, the Court finds that the information is relevant and

important to the litigation. Mr. Yeap has been highly successful in evading court orders and

dispersing his wealth in a way that has frustrated CEIR's ability to enforce its judgments against

him. (Goldstein Decl. ¶¶ 3-9.) The documents sought in the subpoena – including information

about Mr. Yeap's assets and recent account activity at Deutsche Bank – could aid in tracing his

movements and allow CEIR to collect on its judgment. Accordingly, this factor weighs in favor

of enforcing the subpoena.

## 2. The Specificity of the Requests

CEIR represents that the subpoena is "specific where specificity is possible." (Pet. Mot.

at 24.) It notes that given Mr. Yeap's various financial involvements with Deutsche Bank, CEIR

cannot know the full scope of the documents that may be in Deutsche Bank's possession.

Nevertheless, Deutsche Bank objects to the scope of the subpoena, calling it "overbroad, vague,

ambiguous, and unduly burdensome." (Hammond Decl., Ex. 7 at 2.)

16

Specificity in subpoena requests is favored in this District. For example, in <u>Curveal</u> <u>Fashion</u>, the court supported the subpoena requests because they were "narrowly tailored . . . to target Defendants' accounts . . . which Plaintiffs have shown to be a repository for . . . funds received by Defendants." <u>Curveal Fashion</u>, 2010 WL 808639, at *3; <u>see also</u> <u>Qi Andrew</u>, 276 F.R.D. at 152 (finding requests sufficiently specific when the movants targeted specific accounts and provided account numbers for defendants); <u>Milliken</u>, 758 F. Supp. 2d at 247 (finding requests sufficiently specific when the requesting party directed its request "exclusively to the account at issue or any lien asserted by the Bank").

Here, the Court finds that the requests are narrowly tailored, in part. Some of CEIR's requests are directed to specific account numbers or at least to accounts that can be readily identified by Deutsche Bank. <u>See, e.g.</u>, Subpoena Requests Nos. 10, 11 & 12. Other requests, however, are substantially more far reaching. For example, Subpoena Request No. 9 seeks "[d]ocuments sufficient to identify each and every account . . . of any entity legally or beneficially owned in whole or in part by Yeap Soon Sit, or as to which Yeap Soon Sit is or was an authorized signatory." This request is unreasonably broad – in that it assumes that CEIR could collect on the assets of any entity which Mr. Yeap owned in part, or for which he was an authorized signatory; it is also overly burdensome – in that it assumes that Deutsche Bank could readily identify the entities that Mr. Yeap owns "in whole or in part."

It is true that CEIR faces a dearth of information about Mr. Yeap's whereabouts and, as a result, seeks broad discovery regarding his assets. But several of the 13 requests in the subpoena broaden the scope of this discovery beyond that generally supported by courts in this District (to say nothing of the burden placed on Deutsche Bank to investigate all of its accounts

in order to be in full compliance). Because there are reasonable justifications for some, but not all, of the requests, this factor is neutral.

### 3. Whether the Information Originated in the United States

It is undisputed between the parties that the documents and communications sought in the subpoena *duces tecum* all originated outside the United States. The overseas location of this information weighs in favor of non-enforcement of the subpoena. Linde v. Arab Bank, 262 F.R.D. 136, 150 (E.D.N.Y. 2009); Curveal Fashion, 2010 WL 808639, at *3.

### 4. Alternative Methods of Securing Information

"[I]f the information sought can be easily obtained elsewhere, there is little or no reason to require a party to violate foreign law." Reino de Espana, 2005 WL 1813017, at *9 (citations omitted). But if the information cannot be "*easily obtained*" through such alternative means, this factor weighs in favor of disclosure through the subpoena. Curveal Fashion, 2010 WL 808639, at *3 (emphasis in original) (citing British Int'l Ins., 2000 WL 713057, at *9).

### (a) The Hague Evidence Convention

The Hague Evidence Convention outlines a procedure by which parties may "request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence." (Hague Evidence Convention, Art. 1.)

Singapore has expressed a commitment to the Hague Evidence Convention by incorporating it into its local laws. In 1985, Singapore enacted the Evidence (Civil Proceedings in Other Jurisdictions) Act (Cap 98, 1985 Rev Ed) that gives it domestic application. (Singh Decl. ¶ 40 & Ex. 17 (the "Evidence Act").) The Evidence Act applies to any commercial or civil matter, (Evidence Act, Art. 2), and empowers the High Court of Singapore to order the production of documents (id., Art. 4). The Evidence Act provides a procedure for the evaluation

of discovery requests: the requesting court transmits a Letter of Request to the Registrar of the

Supreme Court of Singapore, local counsel can make an application, time is reserved for

objections, and a fee is requested that is dependent on the length of the request. (Singh Decl. ¶

42.)

Once the Singapore Court receives a Letter of Request, it determines whether (a) the

application is made pursuant to a request issued by or on behalf of a court or tribunal; and (b)

the evidence to which the application relates is for civil proceedings that have been instituted

before the Requesting Court. If the Court is satisfied, it issues an order consistent with the Letter

of Request. (Id. ¶ 43.) The Court does not edit the requests; it either approves or rejects them in

the entirety. (Id, ¶ 45.) A Letter of Request may be contested but such challenge has "never"

occurred. (Id. ¶ 42 & Ex. 18 at 26.)

### (b) Hague Evidence Convention as a Viable Alternative

Whether or not the Hague Evidence Convention is indeed a viable alternative is a fact

intensive inquiry, requiring "scrutiny in each case of the particular facts, sovereign interests, and

likelihood that resort to those procedures will prove effective." Aerospatiale, 482 U.S. at 544. It

is neither the exclusive means for obtaining discovery from a foreign entity, nor is it a first

resort. Id. at 534, 542 (noting that the preamble to the Convention does not speak in mandatory

terms and the text of the Convention does not modify the law of any contracting state or require

any state to use Convention procedures). Moreover, courts in this District have held that Hague

Evidence Convention requests do not have to be "futile" before a court can forego its

procedures. Weixing Li, 2011 WL 6156936, at *7. Indeed, "[i]n many situations the Letter of

Request procedure authorized by the Convention would be unduly time consuming and

expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules." Aerospatiale, 482 U.S. at 542.

CEIR and Deutsche Bank debate whether the Hague Evidence Convention is a reasonable alternative avenue for discovery. CEIR further argues that it is Deutsche Bank's burden to prove that the Hague Evidence Convention is not a viable alternative, and that CEIR should prevail on its motion because Deutsche has failed to satisfy its burden. The Court agrees with those cases that find that "a party seeking the application of the Hague Evidence Convention procedures, rather than the Federal Rules of Civil Procedure, bears the burden of persuasion." Strauss, 249 F.R.D. at 435; accord In re Vivendi Universal, S.A., Securities Litig., 02 Civ. 5571 (RJH)(HBP), 2006 WL 3378115, at *2 (S.D.N.Y. Nov. 16, 2006) (citing cases); In re Auto Refinishing Paint Antitrust Litig., 358 F.3d 288, 305 (3rd Cir. 2004) (citing cases). This rule is consistent with the general burden of establishing an undue burden that lies with the party opposing the subpoena. Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004); 9A Wright and Miller, Fed. Prac. and Proc. § 2463.1 (3d ed. 2013). This is, however, a burden of persuasion, not of proof, and Deutsche Bank has met its burden by providing evidence of convincing force that the Hague Evidence Convention provides a realistic opportunity for discovery in Singapore.

Addressing the adequacy of the Singapore's process, CEIR argues that two practical barriers inhibit recourse through the Hague Evidence Convention. First, it predicts a long delay – as much as 6-12 months – to process its request; and second it argues that the Singapore High Court will not endorse a discovery request as broadly constructed as CEIR's subpoena.

Deutsche Bank offers information that mollifies these concerns. Deutsche Bank has repeatedly offered to cooperate with CEIR in its application under the Hague Evidence

Convention. Its expert suggests that such cooperation could reduce the processing time to 4-6 weeks. Although arguably overly ambitious, something less than six months seems reasonable given the parties' cooperative relationship to date and the Singapore courts' familiarity with the parties and interests. A prompt response by the Singapore courts is also consistent with the two and a half months it took for CEIR to obtain the High Court Disclosure Order allowing it to inspect the banker's books for accounts held by S.A. Minerals at Deutsche Bank AG Singapore. Although CEIR does not have the burden of persuasion, it has not offered any evidence to rebut Deutsche Bank's expert's representations, such as information that Letters of Request submitted to the Singapore courts languish or are routinely denied. Moreover, the estimated time frame for obtaining discovery is far shorter than those that have raised concerns for courts in this District. See, e.g., Milliken, 758 F. Supp. 2d at 248 (finding that the Hague Evidence Convention was not a viable alternative in China based on a statement from the U.S. Department of State that "requests have not been particularly successful in the past [and] may take more than a year to execute").

With respect to the scope of CEIR's subpoena, Deutsche Bank's expert represents that Singapore permits discovery of "classes of documents" as long as they are described accurately and are not overly broad. (Singh Decl. ¶ 50.) Deutsche Bank's expert opines that the "documents sought under the Subpoena would, in my view, fall within the type of discovery which would be permitted under Singapore law." (Id.) CEIR offers no evidence to the contrary, and therefore there is no basis for this Court to conclude that CEIR's inability to specify the precise documents it seeks will hinder its discovery. Indeed, Singapore's Evidence Act, which codified the Hague Evidence Convention into domestic law, permits the High Court to order the production of documents "as may appear to the High Court to be appropriate for the purpose of

giving effect to the request in pursuance of which the application is made." (Evidence Act, Art. 4.) This provides further support for the proposition that there is no bright line rule prohibiting broad disclosure and that Singapore law will permit the scope of discovery sought in the subpoena so long as it is deemed "appropriate for the purpose of giving effect to the request." (Id.) Cf. First Am. Corp. v. Price Waterhouse LLP, 154 F.3d 16, 23 (2d Cir. 1998) (finding that the Hague Evidence Convention not a viable alternative because the U.K. courts require each document to be specifically described, a level of specificity that was impossible given the circumstances).

Of course, the ultimate result of a discovery request through the Hague Evidence Convention, and the length of time it will take, is speculative. The only objective information provided to the Court is the 2008 Response of Singapore to the Questionnaire concerning use of the Hague Evidence Convention. (Goldstein Decl., Ex. B.) What this questionnaire reveals, however, is merely that in 2007 there was just one application under the Hague Evidence Convention for documentary evidence and that the time from receipt to execution took "between 6 and 12 months." (Id. at 8.) Given the data sample, and the staleness of this information, it is hardly dispositive of a system that does not work.

Mindful of the interests at stake, the better course is "to forebear from assuming that the Hague Evidence Convention is not a viable option until the [Singapore] authorities have had a meaningful opportunity to comply" with a request. Forbse, 2012 WL 1918866, at *7. Accordingly, facing no concrete evidence to the contrary, all information points towards the Hague Evidence Convention as a viable alternative to obtaining discovery in Singapore.

### (c) Direct Application to the Singapore High Court

Deutsche Bank also suggests that CEIR proceed through the Singapore High Court

directly. That court already entered a judgment granting CEIR leave to enforce the interim

order, Deutsche Bank argues, and therefore CEIR could make an application to the Singapore

High Court to obtain the customer account information sought in the subpoena. (Singh Decl. ¶

7.) In addition, the High Court has already granted CEIR "the right to inspect and take copies of

any entries in the banker's books . . . of Deutsche Bank AG Singapore for the period between

May 2009 to current date" for the accounts relating to S.A. Minerals. (High Court Disclosure

Order.)

The Court, however, agrees with CEIR that this route would not yield information

comparable to that sought in the subpoena. The High Court Disclosure Order was limited to

"banker's books," and the main issue in CEIR's discovery efforts is to go beyond Mr. Yeap's

personal accounts held at Deutsche Bank which, according to CEIR, were closed in 2011.

Accordingly, while certain information might be "easily obtained" through this process, it

would not be comparable information.

### 5. Balance of National Interests

"The fifth factor under the Restatement framework requires the Court to engage in the

precarious task of balancing the interests of the United States against the interests of a foreign

nation." Forbse, 2012 WL 1918866 at *7. Determining this balance swells with importance

when the substance of the matter concerns issues of national concern. See, e.g., Strauss, 249

F.R.D. at 443 (the United States' goal of combating terrorism diminishes any competing

interests of a foreign state). For these reasons, where the request is initiated by the U.S.

government for purposes of an enforcement action or criminal prosecution, courts recognize the

significant interests of the United States. <u>See, e.g.,</u> <u>In re Grand Jury Subpoena Dated Aug. 9,</u> <u>2000</u>, 218 F. Supp. 2d 544, 562 (S.D.N.Y. 2002) ("[T]he Court owes some deference to the determination by the Executive Branch . . . that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure.") (citations omitted); <u>Minpeco</u>, 116 F.R.D. at 523 ("The United States has a strong national interest in enforcing its antitrust and commodities fraud laws . . . to ensure the integrity of its financial markets.").

By contrast, where the interest is a generalized interest in "fully and fairly adjudicating matters before its courts," <u>Strauss</u>, 249 F.R.D. at 443, courts allocate relatively less weight to the United States in this analysis. <u>See, e.g.,</u> <u>Milliken</u>, 758 F. Supp. 2d at 248; <u>Minpeco</u>, 116 F.R.D. at 523 ("It is of some significance that the cases involved here are private civil actions rather than criminal or civil enforcement proceedings in which the United States government is the party moving to compel."). This is not, however, to understate the United States' interest in the "fair adjudication of commercial interests . . . [which] requires full discovery." <u>Milliken</u>, 758 F. Supp. 2d at 249.

Relative to the United States, Singapore has an interest in enforcement of its bank laws to protect the privacy of its customers. As an expression of this interest, as discussed earlier, Singapore has instituted bank secrecy statutes that place the authority of determining the appropriateness of disclosure of customer information with the High Court of Singapore. (Singh Decl. ¶¶ 16-18.) <u>See</u> <u>Minpeco</u>, 116 F.R.D. at 524 (finding that Switzerland has a "substantial" interest in its bank secrecy laws where prohibition is codified and violators are subject to criminal penalties). The commitment to its banking laws certainly appears stronger in present-day Singapore than it did in Germany at the time of <u>U.S. v. First Nat'l City Bank</u>, 396 F.2d 897 (2d Cir. 1968), where bank secrecy was not required by statute; instead, a doctrine that

considers secrecy a privilege, and the penalty of a fine (as opposed to criminal sanctions) for its violation did not express a sufficient interest in confidentiality.

Banking secrecy laws alone do not necessarily tip the balance in favor of the foreign jurisdiction. See Aerospatiale, 482 U.S. at 544 n.29 ("American courts are not required to adhere blindly to the directives of [foreign blocking statutes]."). Indeed, in Weixing Li, the court gave scant weight to China's interest in its bank secrecy laws because it found that thirteen different organs in China had the power to inquire, freeze, and deduct money from individual accounts, and that the secrecy laws have been used to facilitate serious violations of U.S. law. Weixing Li, 2011 WL 6156936, at *10. But no evidence of similar acts has been provided or alleged here, so the Court must assume that the laws are an accurate reflection of Singapore's national interests.

Accordingly, notwithstanding the United States' generalized interest in the enforcement of U.S. judgments, the Court finds that Singapore's specific interest in bank customer secrecy favors non-enforcement of the subpoena, especially in light of Deutsche Bank's non-party status. Qi Andrew, 276 F.R.D. at 157.

### 6. Hardship of Compliance

The hardship prong of the international comity analysis considers two related factors: possibility of sanctions and the status of the entity in the underlying action.

If compliance with a discovery request would subject the party on whom compliance is sought to liability or sanctions, this factor will weigh against compelling disclosure. Generally, courts require specific evidence that an institution would be punished for complying with a foreign court order, whether it is a court cases or data regarding enforcement. See Weixing Li, 2011 WL 6156936, at *11 (finding that the Bank of China would not face severe hardship

because the Bank did not cite a single instance in which a Chinese financial institution was punished for complying with a court order); Qi Andrew, 276 F.R.D. at 159 (finding that the hardship factor weighed in favor of the Bank of China because the banking regulations had been used to the detriment of banks in the past, and the potentially harsh sanctions applicable to the Banks).

The requirement that an entity resisting disclosure must provide specific instances of enforcement is relaxed, however, where that entity is a non-party to the action. Minpeco, S.A. v. Conticommodity Servs., Inc., 118 F.R.D. 331, 332 (S.D.N.Y. 1988) ("An order compelling production should be imposed on a nonparty . . . only in extreme circumstances."). Indeed, where "the party sought to be compelled to produce documents in violation of foreign secrecy laws is merely a neutral source of information, and not itself a target of criminal investigation or an adverse party in litigation, some courts have found the hardship to weigh more heavily in the balance." Minpeco, 116 F.R.D. at 526. In such instances, the entity opposing the subpoena does not need to prove that it will certainly be punished if forced to comply with plaintiffs' subpoenas, "but they must show that the possibility of civil and/or criminal punishment is more than speculative." Qi Andrew, 276 F.R.D. at 158; see also Minpeco, 116 F.R.D. at 527 ("the factor which distinguished the early Second Circuit cases adopting a restrictive approach to ordering discovery in the face of foreign nondisclosure laws was the fact that they all involved a nonparty witness") (citation omitted).

The Court has already decided that disclosure of the information here would violate Singapore's banking laws, and Deutsche Bank has provided the Court with the provisions of the Banking Act that state the criminal penalties that can be imposed. While Deutsche Bank did not offer evidence of or statistics on Singapore's enforcement of these laws, it did include a

statement from the Deputy Prime Minister in 2001 at a Parliamentary debate that the penalties

for violating the secrecy laws are the "biggest penalty of the Banking Act." (Singh Decl. ¶ 17.)

Therefore, while concrete data regarding enforcement would provide more convincing

evidence, in light of Parliamentary statements, the likelihood of prosecution does not appear to

be merely "slight and speculative." <u>Curveal Fashion</u>, 2010 WL 808639, at *2.[2]

In any event, the need for concrete evidence regarding Singapore's prosecution rate for

violation of secrecy laws is obviated by Deutsche Bank's status as a non-party. CEIR urges the

Court to consider that Deutsche Bank is not a "prototypical non-party" and "more than a

bystander," and provides a narrative of its central role in the management of Mr. Yeap's assets.

(Goldstein Decl. ¶¶ 10-23; Pet. Motion at 19-20.) In particular, CEIR argues that respondent

Tantalum is an affiliate of Deutsche Bank and the alter ego of Mr. Yeap. But the significance of

these allegations signal, at most, that Deutsche Bank possesses extensive personal information

about Mr. Yeap's assets. CEIR still does not allege wrongdoing by Deutsche Bank. This Court

declines to change the status of the Bank, a move that would have legal significance beyond the

boundaries of this action.

Accordingly, because compelling disclosure would put non-party Deutsche Bank or its

employees at risk of criminal sanctions, and because Singapore plainly has made bank secrecy a

priority and a key to its success in the global financial market, this factor weighs against

compelling disclosure.

---

[2] The Court takes judicial notice of a 2008 Financial Times article reporting that seven former Citibank employees had been charged under Singapore's bank secrecy laws for accessing client information without authorization. John Burton, *Ex-Citibank Bankers Charged in Singapore*, THE FINANCIAL TIMES, Jan. 24, 2008 at http://www.ft.com/cms/s/0/83d71216-caab-11dc-a960-000077b07658.html#axzz2VqKPRoiE (noting that "Singapore has some of the world's strictest bank secrecy laws, which have helped make it the fastest-growing wealth management centre") (last visited June 11, 2013).

### 7. Good Faith of the Party Resisting Discovery

"Although good faith will not insulate a party from the obligation to respond in discovery, bad faith delays and dilatory tactics will weigh against the objecting party." <u>Weixing Li</u>, 2011 WL 6156936, at *12 (citing <u>Milliken</u>, 758 F. Supp. 2d at 250). Given that there is no dispute that Singapore has adopted banking secrecy laws, the Court cannot find that Deutsche Bank's opposition to the subpoena has been in bad faith.

### C. Summary of the Comity Analysis

After consideration of the various interests implicated in this dispute, the Court finds that the weight of the analysis favors denying CEIR's motion to compel enforcement of the subpoena. Accordingly, within two weeks and with the cooperation of Deutsche Bank, CEIR shall submit for the Court's endorsement a Letter of Request to be submitted to the Singapore courts pursuant to that country's Hague Evidence Convention procedures.

### III.   The Separate Entity Rule

In addition, the parties debate whether New York's separate entity rule provides another basis for denying the enforcement of the subpoena, as Deutsche Bank argues, or whether, CEIR claims, the rule is limited to attachment or turn-over proceedings and, in any event, may no longer be viable in light of a 2009 New York Court of Appeals decision.

The separate entity rule requires that courts treat "each branch of a bank . . . as a separate entity, in no way concerned with accounts maintained by depositors in other branches or at a home office." <u>Ayyash v. Koleilat</u>, 957 N.Y.S.2d 574, 580 (N.Y. Sup. Ct. 2012) (citing <u>Cronan v. Schilling</u>, 100 N.Y.S.2d 474, 476 (N.Y. Sup. Ct. 1950)). The rule has long been applied in New York as "a qualifier on the court's *attachment power* under New York law in the specific context of extraterritorial banking, even where personal jurisdiction over a defendant is

28

otherwise obtained vis-à-vis a New York branch." <u>Shaheen Sports, Inc., et al. v. Asia Ins. Comp., Ltd</u>, 98 Civ. 5951 (LAP), 2012 WL 919664, at *5 (S.D.N.Y. March 14, 2012) (emphasis supplied); <u>accord</u> <u>Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.</u>, 341 F.2d 50, 53 (2d Cir. 1965) (the separate entity rule requires that "'each branch of a bank [be] treated as a separate entity *for attachment purposes*'") (emphasis supplied); <u>Forbse</u>, 2012 WL 1918866 at *11 (the role of the separate entity rule is "to restrict the prejudgment attachment of assets, or postjudgment turnover of assets, that is otherwise authorized under the New York Civil Practice Law and Rules"); <u>Weixing Li</u>, 2011 WL 6156936, at *4 n.6 ("The separate entity rule . . . applies only for attachment purposes.") (citation omitted).

By contrast, where the remedy sought is an injunction or a subpoena, the separate entity rule has not barred enforcement; courts have held that only personal jurisdiction over the legal entity, the bank and its branches, is necessary. <u>See</u> <u>First City Nat'l Bank</u>, 379 U.S. at 384 (holding that, in the context of injunctions, "once personal jurisdiction of a party is obtained, the District Court has authority to order it to freeze property under its control, whether the property be within or without the United States"); <u>EM Ltd.</u>, 695 F. 3d at 208 ("[I]n the run-of-the-mill execution proceeding, we have no doubt that the district court would have been within its discretion to order the discovery from third-party banks about the judgment debtor's assets located outside the United States."); <u>Eitzen Bulk</u>, 827 F. Supp. 2d at 240 (finding that the separate entity rule did not bar enforcement of a post-judgment subpoena *duces tecum* served on a New York branch of the Bank of India because court had personal jurisdiction over a defendant); <u>Abuhamda v. Abuhamda</u>, 654 N.Y.S.2d 11 (1st Dep't 1997) (freezing order directed at bank branch in Jordan was authorized where bank engaged in business in the state and was therefore subject to its jurisdiction).

Deutsche Bank relies on Ayyash v. Koleilat, a recent state court decision that held that the separate entity rule barred the enforcement of a post-judgment subpoena *duces tecum* issued on the New York branches of foreign financial institutions. The court reasoned that subpoenas are "but a first step in the proceeding . . . . For the Court to start down this path, knowing that the ultimate goal is unavailable in this jurisdiction would be an unproductive waste of judicial resources." Ayyash, at 957 N.Y.S.2d at 582.

This Court joins its federal colleagues in rejecting this proposition, which would improperly expand the application of the separate entity rule. See, e.g., Forbse, 2012 WL 1918866, at *11 n.9 ("[T]he continued viability of the separate entity rule may become relevant if Tiffany . . . seeks a postjudgment turnover order directed at defendants' assets held at foreign branches of the Banks."); Weixing Li, 2011 WL 6156936, at *4 n.6 ("the separate entity rule may become relevant to this action following an entry of default judgment against Defendants" and plaintiffs seek the attachment of property). Application of the separate entity rule in the discovery context would be inconsistent with the underlying policy justifications for the rule, which are to avoid confusion and prevent competing claims over assets held in a foreign branch. Because this Court has jurisdiction over Deutsche Bank, it could, as a procedural matter, order the production of documents held out of state.

The Court's conclusion is reinforced by the 2006 amendment to CPLR 5224, which establishes the extraterritorial reach of a subpoena *duces tecum* under New York law, subjecting a corporation to "the full disclosure prescribed by [CPLR § 5223] whether the materials sought are in the *possession, custody or control* of the [corporation] within *or without* the state." CPLR 5224(a–1) (emphasis supplied). Notably, the New York Court of Appeals recently distinguished between those provisions of the CPLR that employ "a broader 'possession, custody or control'

standard," such as CPLR 5224, to those that "utilize the narrower 'possession or custody' standard," such as CPLR 5225(b). <u>Commw. of the Northern Marina Islands v. Canadian Imperial Bank of Commerce</u>, 21 N.Y. 55, 2013 WL 1798585 (Apr. 30, 2013). It recognized that "various courts have interpreted 'possession, custody or control' to allow for discovery from parties that had practical ability to request from, or influence, another party with the desired discovery documents." <u>Id</u>. Thus, <u>Commw. of the Northern Marina Islands</u> further supports the extraterritorial reach of CEIR's subpoena.

The historic role of the separate entity rule, coupled with the plain language in CPLR 5224 and the recent Court of Appeals' decision interpreting similar provisions of the CPLR, leaves this Court with the firmly held view that the separate entity is not, in itself, a legitimate basis for Deutsche Bank to avoid compliance with the subpoena. Thus, should CEIR return to this Court after a reasonable effort to comply with Singapore law either through the Hague Evidence Convention or otherwise, Deutsche Bank cannot use this New York rule as a shield from disclosure.

## CONCLUSION

Under the principles of international comity, a New York court should not encroach upon another nation's sovereignty by requiring citizens to take actions within their home country that would contravene that country's laws. Because I find that alternative avenues for relief exist under the Hague Evidence Convention, CEIR's motion to compel enforcement of the subpoena must be DENIED.  The Clerk of Court is directed to terminate the motion at Docket No. 52. CEIR may seek relief through the Hague Evidence Convention in Singapore. It should promptly file with this Court a Letter of Request to effectuate that application.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   New York, New York
         June 11, 2013